

# ARKANSAS COURT OF APPEALS

DIVISION II
**No.** CV-13-256

| | |
|---|---|
| JEREMIAH CALAHAN | **Opinion Delivered** SEPTEMBER 18, 2013 |
| APPELLANT | APPEAL FROM THE MONROE COUNTY CIRCUIT COURT [NO. JV-10-5] |
| V. | |
| | HONORABLE ANN HUDSON, JUDGE |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES and MINOR CHILD | |
| APPELLEES | AFFIRMED; MOTION TO BE RELIEVED GRANTED |

**DAVID M. GLOVER, Judge**

The parental rights of Jeremiah Calahan to his daughter, L.J.C., born February 16, 2010, were terminated by an order entered December 26, 2012.[1] Pursuant to *Linker-Flores v. Arkansas Department of Human Services*, 359 Ark. 131, 194 S.W.3d 739 (2004), and Rule 6-9(i) of the Rules of the Arkansas Supreme Court and Court of Appeals, Calahan's attorney has filed a no-merit brief asserting that there are no issues that would support a meritorious appeal and a motion requesting to be relieved as counsel. The clerk of this court provided Calahan with copies of his counsel's motion and brief and notified him of

---

[1]Julie Calahan's parental rights were also terminated in this order, but she is not a party to this appeal.



his right to file pro se points of appeal. Calahan has filed points, but DHS has not filed a responsive brief.

This case began in February 2010 when DHS filed a petition for emergency custody of L.J.C. on two bases: that L.J.C.'s sister, L.C., died at eleven months of age in Virginia as a result of subdural hematomas from being shaken; and that Calahan's stepson, L.D., was placed in foster care in Virginia due to multiple injuries he sustained while in the Calahans' care, including healed burn marks, broken bones, bruises, and blunt-force trauma to the abdomen that resulted in a perforated intestine requiring emergency surgery. The Calahans maintained that L.D.'s injuries were self-inflicted; by contrast, L.D. had not sustained any unusual injuries after being removed from the Calahan home. The trial court granted DHS's request for emergency custody. An adjudication hearing was held in April 2010, at which time L.J.C. was adjudicated dependent/neglected based on the death of L.C. and the severe injuries sustained by L.D. A permanency-planning hearing was held in February 2011; Calahan was not present. The trial court found that L.J.C. had been subjected to aggravated circumstances and that there was little likelihood of reunification; the goal of the case was changed from reunification to termination. A petition for termination of parental rights was filed in April 2011, and a hearing was held in September 2012 on that petition. After the hearing, the trial court found that it was in the best interest of L.J.C. for Calahan's parental rights to be terminated and that DHS had proven grounds for terminating Jeremiah's parental rights under Ark. Code Ann. §§ 9-27-341(b)(3)(B)(i)*(a)* (the child has been adjudicated dependent/neglected and has continued

SLIP OPINION

out of the parent's custody for twelve months and the conditions causing removal have not been remedied by the parent despite a meaningful effort by the department to rehabilitate); (b)(3)(B)(vi)*(a)* (the court has found the juvenile or a sibling dependent/neglected as a result of neglect or abuse that could endanger the life of the child, any of which was perpetrated by the juvenile's parent or step-parent); (b)(3)(B)(ix)*(a)(2)* (the parent is found by a court of competent jurisdiction, including the juvenile division of circuit court, to have committed a felony battery that results in serious bodily injury to any juvenile); (b)(3)(B)(vii) (other factors arose subsequent to the filing of the original petition for dependency/neglect that demonstrated that the return of the juvenile to the custody of the parent was contrary to the juvenile's health, safety, or welfare); and (b)(3)(B)(ix)*(a)(3)* (the parent is found by a court of competent jurisdiction to have subjected any juvenile to aggravated circumstances).

At the termination hearing, Lisa Wall, a child protective-services investigator with the City of Virginia Beach Department of Human Services, testified that she had been involved with three investigations of Calahan, that she had interviewed him in April and May 2009 regarding the blunt-force abdominal injuries sustained by L.D., and that Calahan had maintained that L.D.'s injuries were self-inflicted. Wall said that she made findings against Calahan for internal injuries, physical abuse, physical neglect, and inadequate supervision based on L.D.'s injuries; she further stated that since L.D. had been placed in foster care, he had not sustained any significant injuries. She testified that while the investigation on L.D. was still open and active, she received another referral in May

2009 on the Calahans' daughter L.C., which resulted in Wall petitioning for an emergency removal order for L.D. and an emergency protection order for L.C., both of which were granted. Wall stated that, to her knowledge, her findings were not appealed and that L.D. was still in protective custody. However, L.C. had sustained severe subdural hemorrhaging and a skull fracture, and as a result of those injuries, she died in May 2009. When interviewed, Calahan stated that he did not know how L.C. could have been injured, and he denied that either he or his wife hurt L.C. In 2011, Virginia DHS filed charges against Julie Calahan in the death of L.C., and she later pleaded guilty to the murder of L.C. Wall testified that Jeremiah Calahan was not charged in L.C.'s death, and she admitted that there was no physical evidence to link him to L.D.'s injuries.

Annette Scott, an employee of Arkansas DHS's Children and Family Services, testified that neither of the Calahans completed in-home counseling; that they were both noncompliant with the case plan; that the grandparents did not complete the paperwork for relative placement; and that no other relative inquired about relative placement. She stated that L.J.C. was adoptable.

Jeremiah Calahan testified that he was still married to Julie. When asked about L.D.'s injuries, Calahan continued to assert that L.D.'s injuries were self-inflicted. He stated that after L.D. was removed from their home, he and Julie made arrangements with Child Protective Services in Virginia for L.C. to remain in the home by having his brother, Stephen, move into the house with them. It was after Stephen moved in that L.C. suffered her fatal injuries.

4

SLIP OPINION

Nicole Hampton, L.J.C.'s foster mother, testified that she would like to adopt L.J.C. if parental rights were terminated.

In *Myers v. Arkansas Department of Human Services*, 2011 Ark. 182, at 15–16, 380 S.W.3d 906, 915, our supreme court set forth the standard of review in appeals concerning the termination of parental rights:

> Our standard of review in cases involving the termination of parental rights is well established. Arkansas Code Annotated section 9-27-341(b)(3) (Repl. 2009) requires an order terminating parental rights to be based upon clear and convincing evidence. Clear and convincing evidence is that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. *Camarillo-Cox v. Ark. Dep't of Human Servs.*, 360 Ark. 340, 201 S.W.3d 391 (2005). When the burden of proving a disputed fact is by clear and convincing evidence, the question that must be answered on appeal is whether the trial court's finding that the disputed fact was proven by clear and convincing evidence was clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* Such cases are reviewed de novo on appeal. *Wade v. Ark. Dep't of Human Servs.*, 337 Ark. 353, 990 S.W.2d 509 (1999). However, we do give a high degree of deference to the trial court, as it is in a far superior position to observe the parties before it and judge the credibility of the witnesses. *Dinkins v. Ark. Dep't of Human Servs.*, 344 Ark. 207, 40 S.W.3d 286 (2001).

> In order to terminate parental rights, a trial court must find by clear and convincing evidence that termination is in the best interest of the juvenile, taking into consideration (1) the likelihood that the juvenile will be adopted if the termination petition is granted; and (2) the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A)(i) & (ii) (Repl. 2009). Additionally, the trial court must find by clear and convincing evidence that one or more statutory grounds for termination exists. Ark. Code Ann. § 9-27-341(b)(3)(B).

Here, L.J.C.'s siblings had suffered severe abuse—even fatal in L.C.'s case—while in the care of Jeremiah and Julie Calahan. In the adjudication order, the trial court found

SLIP OPINION

by clear and convincing evidence that either Julie or Jeremiah had caused the death of L.C. and that Jeremiah had caused severe physical injury to L.D. While the Calahans did appeal the adjudication order, *Calahan v. Arkansas Dep't of Human Servs.*, 2011 Ark. App. 165, they did not challenge the sufficiency of the evidence of the finding of dependency/neglect made at the adjudication hearing. It is clearly not in L.J.C.'s best interest to be returned to Calahan's custody. Calahan's stepson had been severely injured while in Calahan's custody, and Calahan's daughter had suffered fatal injuries. Given such evidence, the trial court is not required to return L.J.C. to the Calahans' custody to see if she will also be injured. Furthermore, L.J.C. was clearly adoptable, as her foster mother testified that she would like to adopt her if parental rights were terminated. With respect to the grounds for termination, only one ground is required to be proven for termination. *Myers*, *supra*. Here, the trial court found that L.J.C.'s life could be endangered based on the fact that L.D. had suffered severe physical injury at Calahan's hands, which satisfies one of the grounds to be proven for termination.

*Adverse Rulings*

There were several rulings during the course of the termination hearing adverse to Calahan. First, during Lisa Wall's testimony, she began to testify as to what a physician had told her caused L.D.'s injuries; Calahan's attorney objected on the basis that it was hearsay and that Calahan could not confront the doctor with regard to his opinions because the doctor was not being called as a witness. The trial court overruled the

objections; however, Wall did not testify to anything the doctor told her. Therefore, this adverse ruling provides no basis for reversal.

The next adverse ruling occurred when Wall was testifying about the injuries L.D. suffered that caused his removal from the Calahans' home and whether L.D. had suffered any further injuries after being removed from the home. Calahan's attorney objected on the basis that that information was not relevant to the termination hearing. The trial court overruled the objection. A circuit court's evidentiary rulings are reviewed for an abuse of discretion. *Cotton v. Arkansas Dep't of Human Servs.*, 2012 Ark. App. 455, ___ S.W.3d ___. "Relevant evidence" is defined as "evidence having any tendency to make the existence of any fact than is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ark. R. Evid. 401. Here, the question was relevant. It was necessary to determine if L.J.C. would be safe if she remained in the Calahan home. Jeremiah Calahan had told authorities that L.D. had injured himself; therefore, it was relevant to know whether L.D. had injured himself after he was removed from the home, or if Jeremiah Calahan's explanation for the injuries was likely untruthful.

During Calahan's testimony, counsel for DHS showed him the report from the psychological examination performed on him and asked him to read from it. Calahan's counsel objected on the basis that his client could not identify the report, and the document had to be authenticated in order to be introduced or read into the record. The trial court ruled that DHS could proceed regarding the diagnosis because Calahan recalled

SLIP OPINION

the evaluation, but ruled that DHS could not ask Calahan what the psychological evaluator actually said. Calahan testified that the evaluation stated that he was diagnosed with narcissism; however, no other line of questioning on this issue was pursued. This adverse ruling does not create a meritorious issue.

Next, DHS counsel asked Calahan if he was aware that L.D. had indicated that Calahan was the person who punched him in the stomach. Calahan's counsel objected on the basis of hearsay, and the trial court ruled that the question had been asked and answered earlier. Calahan then responded that L.D. would sit and hit himself, and "other people also seen that." DHS objected on the basis of hearsay, which the trial court sustained. Calahan then testified that L.D. was caught at the hospital hitting himself and that the hospital employees saw L.D. hit himself. DHS moved to strike that testimony, which the trial court granted. As Calahan's counsel points out, it is unclear from the testimony whether other people told Calahan that they had seen L.D. hitting himself, or if other people were present when Calahan saw L.D. hitting himself and saw it as well. Even if the statement was not hearsay and should have been allowed into evidence instead of being stricken, there was no prejudice. In the adjudication order, the trial court found that Calahan had caused L.D.'s injuries, a finding that was not appealed. Therefore, these adverse rulings do not present any meritorious issues for reversal.

Next, Calahan testified that he was not sure how long it was between L.D. being injured and when L.C. was taken to the hospital. As he continued to testify about L.C., his counsel objected to any further testimony about L.C. because DHS had previously

8

entered testimony that Calahan's wife, Julie, had pleaded guilty to causing L.C.'s death, that no charges regarding L.C.'s death were brought against Calahan, and that Calahan had nothing to do with L.C.'s death. DHS counsel responded that he was only trying to show Calahan's response after learning that L.C. was injured. The trial court allowed the line of questioning. Calahan testified as to the information he received about L.C.'s injuries. Nothing in this testimony was harmful to Calahan and in fact showed his concern about what happened to L.C.

The last adverse ruling occurred when Calahan testified that L.D. had been diagnosed with oppositional defiant disorder (ODD) and was bipolar. DHS objected to Calahan giving diagnoses, and the trial court sustained the objection. Calahan's counsel then rephrased the question, asking what medications L.D. was taking, and Calahan was allowed to testify that the medications were for ODD and bipolar disorder. Therefore, L.D.'s diagnoses were ultimately entered into evidence.

*Calahan's Pro Se Points*

Calahan's statement of points is an argument that his attorney was ineffective because she believed that he was guilty and did not try to defend him at the hearing. However, this objection was not made to the trial court, and therefore it cannot be addressed now on appeal. Arkansas appellate courts will not consider a claim of ineffective assistance of counsel as a point on appeal unless it was first raised in the trial court. *Weaver v. Arkansas Dep't of Human Servs.*, 2011 Ark. App. 680.

SLIP OPINION

After carefully examining the record and the brief presented to us, we hold that counsel has complied with the requirements established by the Arkansas Supreme Court for no-merit appeals in termination cases and conclude that the appeal is wholly without merit. Accordingly, counsel's motion to withdraw is granted and the order terminating Calahan's parental rights is affirmed.

Affirmed; motion to be relieved granted.

WOOD and BROWN, JJ., agree.

*Deborah R. Sallings*, Arkansas Public Defender Commission, for appellant.

No response.